IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

STATESBORO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.     ) | CR 623-015 |
| ) | |
| JAMAL BRASHAD HAWKINS ) | |

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Defendant, charged with possession of a firearm by a prohibited person, seeks to suppress evidence and statements obtained as a result of a traffic stop on June 1, 2023. After careful consideration of all briefing and the evidence presented at the hearing on March 4, 2024, the Court **REPORTS** and **RECOMMENDS** Defendant's motion to suppress be **DENIED**. (Doc. no. 22.)

**I.     BACKGROUND**

In the early morning of June 1, 2023, at approximately 1:30 a.m., Swainsboro Police Department Staff Sergeant Joshua Bedgood initiated a traffic stop on a vehicle traveling with a headlight out on North Coleman Street in Swainsboro, Georgia. (See Transcript, doc. no. 42, pp. 4-6 ("Tr."); doc. no. 40, Ex. 1, Sgt. Bedgood Body-Worn Camera Video 06012023649 ("Bedgood BWC"), at 1:19:24-1:19:43.)[1] There were reports of gunshots in the vicinity just before the traffic stop. (Tr. 11.) Mr. Legarion Early was the driver, and Defendant was the only passenger. (Tr. 6-7.) Swainsboro Police Department Patrolman Seth Pervis and Corporal FNU Carter, along with Detective James Young, arrived on scene almost immediately. (Tr. 7;

---

[1] The timestamps are cited in accordance with the real-time label on the video footage instead of the video playback time. (See doc. no. 40, Ex. 1.)

Bedgood BWC 1:21:28-1:21:32; see also doc. no. 40, Ex. 1, Detective Young Body-Worn Camera Video 20230601012023_2602 ("Young BWC"), at 1:20:37-1:23:05.)  Within the first three minutes of the traffic stop, Mr. Early tried to present his mother's driver's license as his own, then admitted he was not a licensed driver, and was arrested by Sgt. Bedgood.  (Tr. 6-7, 26; Bedgood BWC 1:19:40-1:21:39.)  Detective Young was the first officer to speak with Defendant, asking for identification.  (Young BWC 1:23:00-1:23:09.)  Defendant said he had no identification with him, asked both Detective Young and Sgt. Bedgood what was happening with Mr. Early, and voiced surprise that Mr. Early had no license.  (Tr. 8; Young BWC 1:23:00-1:23:09; Bedgood BWC 1:21:40-1:21:47.)

Attention then turned to determining how to remove Mr. Early's vehicle from the roadway.  (Tr. 20.)  In this situation, to help car owners avoid unnecessary towing expenses, it is these officers' custom and policy to allow someone else to drive the car after verifying legal driving status.  (Tr. 11-12, 16-17, 21, 29, 36.)  When prompted by Sgt. Bedgood, Defendant explained he was the holder of a valid driver's permit and was willing to drive but did not have the permit with him.  (Bedgood BWC 1:21:45-1:21:54; Young BWC 1:21:40-1:22:06, 1:23:09-1:23:36.)  Detective Young asked his name, and Defendant answered "Mitchell Johnson."  (Young BWC 1:23:05-1:23:15.)  Detective Young explained to Defendant that if his name was cleared through a database search, he could "beat feet," meaning he would be free to leave the traffic stop.  (Tr. 28, 37; Young BWC 1:23:00-1:23:34.)  Sgt. Bedgood testified he did not suspect Defendant of any criminal activity at this time.  (Tr. 16.)

The officers also testified they would have allowed Defendant to drive the car even though he did not have his driver's permit, if they could first verify Defendant's legal driving status through a database check.  (Tr. 35-36.)  To conduct this verification and also check to make sure there were no outstanding warrants, Sgt. Bedgood asked Defendant his name.  (Tr.

2

8-12, 16, 56; Bedgood BWC 1:23:09-1:23:18.)  Defendant repeated the name "Mitchell Johnson" and, without prompting, misspelled his purported last name as: "J-O-H . . . J-O-H-H-S-O-N."  (Tr. 9; Bedgood BWC 1:23:00-1:23:22.)  Based on this obvious misspelling and Defendant's tone, cadence, and body language, Sgt. Bedgood determined Defendant was making up a fake name and asked Defendant to step out of the vehicle.  (Tr. 9-10; Bedgood BWC 1:23:13-1:23:59.)  Sgt. Bedgood asked Detective Young to come back to his side of the vehicle and stated, within close range of Defendant, that he was going to have Defendant "step out" and "detain him."  (Bedgood BWC 1:23:40-1:23:56; Young BWC 1:25:15-1:25:20.)

Defendant asked Sgt. Bedgood if he was "in trouble too," and both Sgt. Bedgood and Detective Young told Defendant "not at this point" and he was only going to be detained "for now."  (Bedgood BWC 1:24:00-1:24:13; Young BWC 1:25:25-1:25:35.)  While handcuffing Defendant, Sgt. Bedgood asked Defendant if he wanted to provide his real name.  (Tr. 9-10; Bedgood BWC 1:24:10-1:24:14.)  Sgt. Bedgood testified that, at this point in the traffic stop, he still would have permitted Defendant to leave had Defendant insisted his real name was Mitchell Johnson or even refused to answer the question of what his real name was.  (Tr. 17-18.)  Instead, however, Defendant responded, "yes sir . . . you're right, you're right."  (Tr. 10; Bedgood BWC 1:24:10-1:26:42.)  Detective Young asked, "You got a warrant?" and Defendant replied he did not.  (Bedgood BWC 1:24:10-1:24:37.)  Defendant stated his name was Tyree Balmer and began spelling it.  (Bedgood BWC 1:24:10-1:24:58.)

Defendant was frisked and placed in the back of Sgt. Bedgood's patrol car while Sgt. Bedgood continued his attempt to find Defendant in the database as Tyree Balmer.  (Tr. 10-12; Bedgood BWC 1:25:00-1:25:59.)  Defendant again told Sgt. Bedgood his name was "Tyree Balmer," provided a birth date of September 18, 1997, and a home address.  (Tr. 13; Bedgood BWC 1:28:52-1:29:51.)  After several more unsuccessful attempts to find this name, Sgt.

Bedgood arrested Defendant for providing a false name and date of birth in violation of O.C.G.A. § 16-10-25.  (Tr. 10, 23; Bedgood BWC 1:30:20-1:33:55; see also doc. no. 40, Ex. 1, Sgt. Bedgood Body-Worn Camera Video 060120236492 ("Bedgood BWC #2"), at 1:33:55-1:36:46.)  After arrival at Emanuel County Jail, an officer found a concealed firearm on Defendant, and the federal indictment charges Defendant with possession of this firearm.  (Tr. 24; see also doc. no. 1.)

## II. DISCUSSION

Defendant concedes officers had the right to ask for his name as a passenger and the traffic stop was reasonable in both scope and duration.  (See doc. no. 43.)  Defendant, however, argues officers did not have probable cause to arrest him for a violation of O.C.G.A. § 16-10-25.  (Id. at 6.)  Moreover, Defendant argues officers should have given Miranda warnings after he was handcuffed and before officers asked for his real name.  (See generally doc. nos. 22, 43.)  But for these violations, Defendant argues, the current charge could not have been brought because the firearm was not discovered until he was searched while being processed at the local jail.  (See generally id.)  For the reasons explained below, the Court finds there was probable cause to make the arrest, and officers had no duty to Mirandize Defendant before asking his real name.

### A. Officers Had Probable Cause to Arrest Defendant

O.C.G.A. § 16-10-25 provides as follows: "A person who gives a false name, address, or date of birth to a law enforcement officer in the lawful discharge of his official duties with the intent of misleading the officer as to his identity or birthdate is guilty of a misdemeanor." O.C.G.A. § 16-10-25.  Citing Holt v. State, 487 S.E.2d 629, 631-32 (Ga. App. 1997), Defendant argues he did not violate this code section by giving a false name because Sgt. Bedgood was not lawfully discharging his official duties when he first asked for Defendant's name.  (See doc. no. 22, pp. 6-

4

7; doc. no. 43, pp. 2-3.) Instead, Defendant contends Sgt. Bedgood was merely trying to find a driver for Mr. Early's vehicle and had no reasonable suspicion Defendant committed any crime. (See generally id.)

Eleven years after Holt, the same court held in Smith v. State that: (1) "official duties" under O.C.G.A. § 16-10-25 include asking a passenger's name and licensure status in an effort to find a person who can drive a stopped vehicle, even in the absence of reasonable suspicion the passenger committed any crime; and (2) a passenger giving a false name in this context provides officers "with probable cause for his arrest" under § 16-10-25. 669 S.E.2d 735, 737 (Ga. App. 2008). The holding in Smith is directly on point, forecloses Defendant's argument, and is notably consistent with ample federal precedent[2] confirming that asking a passenger's identity and legal status to drive are "actions . . . taken in the lawful discharge of [an officer's] duties, which

---

[2] See Rodriguez v. United States, 575 U.S. 348, 354-55 (2015) (taking no issue with officer asking passenger for driver's license); Muehler v. Mena, 544 U.S. 93, 101 (2005) ("[O]fficers did not need reasonable suspicion to ask [a person] for her name, date and place of birth, or immigration status."); Hiibel v. Sixth Jud. Dist. Ct. of Nevada, Humboldt Cnty., 542 U.S. 177, 185 (2004) ("In the ordinary course [of police investigations] a police officer is free to ask a person for identification without implicating the Fourth Amendment."); United States v. Campbell, 26 F.4th 860, 882 (11th Cir.), cert. denied, 143 S. Ct. 95 (2022) (explaining tasks and inquiries unrelated to mission of stop are those "aimed at detecting criminal activity more generally," such as asking about passenger's gang affiliation); Johnson v. Nocco, 91 F.4th 1114, 1124-25 (11th Cir. 2024) (discussing, under applicable Florida statute requiring vehicle passengers to identify themselves, that such is for the "precautionary measure to protect officers safety" and was "legitimate and weighty when [the officer] asked [defendant] to identify himself"); United States v. Forget, 853 F. App'x 534, 536 (11th Cir. 2021) (per curiam) (taking no issue with officer "ask[ing] everyone in [a] truck for identification"); United States v. Vargas, 848 F.3d 971, 971 (11th Cir. 2017) (upholding officer's inquiry whether passenger possessed valid driver's license because driver did not, and thus, "could not legally operate the vehicle"); United States v. Boyce, 351 F.3d 1102, 1106 (11th Cir. 2003) (discussing criminal history check is a "continuation of the original traffic stop such that Edwards could detain Boyce while awaiting the results"); United States v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001) ("The request for criminal histories [of vehicle's occupants] as part of a routine computer check is justified for officer safety. It is both reasonable and minimally intrusive."); United States v. Gaines, No. 5:22-CR-00165-LCB-HNJ, 2023 WL 5989554, at *1 (N.D. Ala. July 7, 2023), adopted by 2023 WL 5278014 (Aug. 15, 2023) (holding officers' inquiry into which of vehicle's occupants could lawfully operate vehicle did not prolong traffic stop because "the stop necessitated ascertainment of which of the vehicle's occupants could lawfully operate it as the driver did not possess a driver's license"); United States v. Henderson, No. 2:20-CR-28, 2021 WL 3684149, at *8 (S.D. Ga. May 12, 2021), adopted by 2021 WL 3030186 (July 19, 2021) ("[Q]uestions aimed at discerning the identity of other passengers are permissible.").

5

include[s] enforcement of the law requiring that any person driving a vehicle be licensed to do so." Smith, 669 S.E.2d at 737.

Relatedly, Defendant contends there was no reason to ask his name because he had already explained to the officers he only had a driver's permit, not a license, and the permit was not in his possession. (Doc. no. 22, pp. 6-7; doc. no. 43, pp. 2-6.) However, a person can legally drive if issued a temporary permit. See, e.g., O.C.G.A. §§ 40-5-67(b)(1)-(2) (authorizing issuance of temporary driving permit to individual charged with driving under influence). In addition, the officers testified it is their custom and policy to allow a passenger to drive a vehicle away from a traffic stop upon verifying the passenger's legal driving status, even if the passenger is not carrying a physical copy of the license or permit. (Tr. 11-12, 16-17, 21, 29, 36.)

### B.     The Officers Had No Duty to Mirandize Defendant Prior to His Formal Arrest

Because of the "nonthreatening character of detentions of this sort," Miranda warnings are generally not required to be given as part of a Terry stop. Berkermer v. McCarty, 468 U.S. 420, 440 (1984); see also United States v. Hardy, 855 F.2d 753, 759 (11th Cir. 1988) ("A Terry stop is justified to give the police an opportunity to engage in brief and nonintrusive investigation techniques, such as noncustodial questioning of the detained person."). In Berkermer, the Supreme Court provided "guidance on the issue of when Miranda warnings may be required before interrogation during a Terry stop." Berkermer, 468 U.S. at 439. "Instead of asking whether a suspect reasonably would feel free to leave," the question is "whether a traffic stop exerts upon a detained person pressures that sufficiently impair his free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights." United States v. Acosta, 363 F.3d 1141, 1148-49 (citing Berkermer, 468 U.S. at 437).

No such unusual pressure occurred here. The traffic stop took place on a public roadway open to public scrutiny and observable to anyone in the area. The officers were kind to Mr. Early

6

and Defendant during the entire encounter and did not raise their voices. The officers did not draw any weapons, order Defendant and Mr. Early to lie down, or use any physical force. Even when Sgt. Bedgood handcuffed Defendant, the officers assured Defendant he was not in trouble "at this point" and explained the detention was temporary, saying Defendant was only going to be detained "for now." (Bedgood BWC 1:24:00-1:24:13; Young BWC 1:25:25-1:25:35.) This was not a deception. Sgt. Bedgood testified that, at this point in the traffic stop, he still would have permitted Defendant to leave had Defendant insisted his real name was Mitchell Johnson or even refused to answer the question of what his real name was. (Tr. 9-10, 17-18.) Instead, Defendant gave the second false name of Tyree Balmer, and the officers formally arrested him when both names proved to be false.

For these reasons, from the outset of the traffic stop through initial handcuffing and until Defendant's formal arrest, the officers did not exert pressures upon Defendant that sufficiently impaired "his free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights." Acosta, 363 F.3d at 1149 (citing Berkermer, 468 U.S. at 437).

Even though the traffic stop itself did not exert the type of pressure that would trigger Miranda warnings, the officers should have Mirandized if the initial handcuffing constituted a formal arrest. As the Supreme Court explained in Berkermer,

> It is settled that the safeguards prescribed by Miranda become applicable as soon as a suspect's freedom of action is curtailed to a "degree associated with formal arrest." California v. Beheler, 463 U.S. 1121, 1125 (1983) (*per curiam*). If a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him "in custody" for practical purposes, he will be entitled to the full panoply of protections prescribed by Miranda. See Oregon v. Mathiason, 429 U.S. 492, 495 (1977) (*per curiam*).

Berkermer, 468 U.S. at 440. In determining whether a stop has risen to the level of a formal arrest, courts consider the totality of the circumstances, including: (1) the law enforcement

7

purposes served by the detention; (2) the diligence with which the officers pursued the investigation; (3) the scope and intrusiveness of the detention; and (4) the duration of the detention. Acosta, 363 F.3d at 1145-46. The most important factor is "whether the police detained [the defendant] to pursue a method of investigation that was likely to confirm or dispel their suspicions quickly, and with a minimum of interference." Id. at 1146.

Here, the totality of the circumstances confirms Defendant's initial handcuffing and placement in the patrol car did not rise to the level of a formal arrest. The officers handcuffed Defendant for safety purposes because they were unsure of his identity, explaining to Defendant they were detaining him briefly while they searched for his name. See Acosta, 363 F.3d at 1150 (finding officer's assurance to defendant he was not under arrest weighed against finding of custody for Miranda purposes); United States v. Fields, 178 F. App'x 890, 894 (11th Cir. 2006) (*per curiam*) (explaining any belief defendant was in custody dispelled by officer stating he was not). The officers did not tarry. Sgt. Bedgood immediately began searching the database for Tyree Balmer, the second false name given by Defendant. The officers were diligent and wasted no time while investigating Defendant's identity and in affecting a formal arrest when it was obvious Tyree Balmer was also a false name. See, e.g., Acosta, 363 F.3d at 1146-48 (finding officers were diligent because "[e]ach investigatory act logically led to the next act which was done without delay"). Indeed, the entire traffic stop only lasted approximately seventeen to twenty-two minutes.

The temporary handcuffing of Defendant and placement in the patrol car was necessary and reasonable and did not render Defendant in custody for purposes of Miranda. To understand why, one need not look no further than United States v. Gil, 204 F.3d 1347, 1351 (11th Cir. 2000) (*per curiam*). Therein, officers conducted a Terry stop, handcuffed defendant, placed her in a patrol car, and formally arrested her seventy-five minutes later, after completing a search of her residence. Id. at 1349-50. Defendant moved to suppress the "fruits of that arrest," arguing her

8

"detention exceeded that allowed by Terry and ripened into a full scale arrest." Id. at 1350. The Eleventh Circuit affirmed the district court's rejection of this argument, explaining in part that even though handcuffing and placement in a patrol car is severe, these actions were reasonable and necessary in the circumstances "to maintain the safety of the officers and the ongoing investigation of the residence." Id. at 1351.

The circumstances here also justified handcuffing and placing Defendant in the patrol car temporarily as reasonable and necessary precautions to ensure officer safety. Indeed, the traffic stop occurred in the early morning hours shortly after reports of shots fired in the vicinity, Mr. Early was illegally driving the vehicle and repeatedly attempted to present his mother's license as his own, and officers had yet to identify Defendant because he gave a false name. The officers testified they handcuffed Defendant and placed him in the patrol car because these circumstances warranted such actions while officers endeavored to determine Defendant's true identity. (Tr. 9-11-12, 32) The decision in Gil and myriad other cases confirm the officers' reasonable and necessary actions did not transform Defendant's detention into a formal arrest that triggered Miranda warnings.[3]

---

[3] See also United States v. Hastamorir, 881 F.2d 1551, 1157 (11th Cir. 1989) ("[T]he agents reasonably believed that the men presented a potential threat to their safety. Agent Kirk's action of drawing his weapon and Hastamorir's handcuffing were reasonable."); United States v. Kapperman, 764 F.2d 786, 790 (11th Cir. 1985) ("[N]either handcuffing nor other restraints will automatically convert a Terry stop into a *de facto* arrest requiring probable cause. Just as probable cause to arrest will not justify using excessive force to detain a suspect, the use of a particular method to restrain a person's freedom of movement does not necessarily make police action tantamount to an arrest. The inquiry in either context is reasonableness."); United States v. Williams, No. 22-10426, 2023 WL 2785223, at *4 (11th Cir. Apr. 5, 2023) (*per curiam*) (affirming officer handcuffing suspect for safety during traffic stop was not *de facto* arrest when deputy "believed himself to be the only officer on the scene, and because [defendant] exited the vehicle quickly, appeared nervous, and appeared to be distancing himself from the vehicle"); United States v. Simmons, No. 8:22-CR-387-SDM-CPT, 2024 WL 1722680, at *12 (M.D. Fla. Jan. 26, 2024), *adopted by* 2024 WL 1720845 (Apr. 22, 2024) ("In this case, Velazquez testified that he removed Simmons from his car and handcuffed him for officer safety reasons . . . [t]his action by Velazquez was reasonable considering the totality of the circumstances, including the presence of a firearm directly under Simmons's seat and the fact that the traffic stop unfolded in a high-crime area."); United States v. Ruoho, 2023 WL 5424759, at *7 (N.D. Ala. July 13, 2023), *adopted by* 2023 WL 5418744 (Aug. 22, 2023) ("Crucially, Officer Ko explained to Ruoho prior to handcuffing her that she was not under arrest or being taken to jail, and that she was being placed in the back of his car specifically so that he could conduct the search of her vehicle.");

Taking into consideration all four factors and the totality of the circumstances, the Court finds Defendant's detention did not rise to the level of a formal arrest until after Sgt. Bedgood determined Tyree Balmer was a fake name and affected the formal arrest of Defendant. No <u>Miranda</u> warnings were required, and there is no basis for suppression of the evidence.

### III.   CONCLUSION

For the reasons set forth above, the Court **REPORTS** and **RECOMMENDS** Defendant's motion to suppress be **DENIED**. (Doc. no. 22.)

SO REPORTED and RECOMMENDED this 29th day of May, 2024, at Augusta, Georgia.

BRIAN K. EPPS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA

---

<u>United States v. Parker</u>, No. 1:10-CR-0176-JEC-JFK, 2010 WL 5313758, at *10 (N.D. Ga. Nov. 18, 2010), *adopted by* 2010 WL 5313449 (Dec. 17, 2010) (finding handcuffing defendant was reasonable for officer safety given nature of drug investigation and observation of gun in passenger compartment).